# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Statesboro Division

FILED
Samuel L. Kay, Clerk
United States Bankruptcy Court
Savannah, Georgia
By lbarnard at 11:37 am, Mar 03, 2011

| | |
|---|---|
| In the matter of: ) | |
| ) | Chapter 11 Case |
| WILLIAM SHAWN GILLIKIN ) | |
| ) | Number <u>09-60178</u> |
| *Debtor* ) | |

## **MEMORANDUM AND ORDER**

### FINDINGS OF FACT

Debtor acquired a 712.55 acre farm in approximately 1990. Debtor's Disclosure Statement, Dckt. No. 210, p. 1; Bank's Disclosure Statement, Dckt. No. 230, p. 2. Beginning in approximately 1997, Debtor began a business known as Southern Home Equity, providing mortgage brokerage services to homeowners. Debtor's Disclosure Statement, Dckt. No. 210, p. 1; Bank's Disclosure Statement, Dckt. No. 230, p. 2. Debtor was involved in the mortgage brokerage business for more than ten years. However, when the economy soured Debtor's business lost profitability and he was left holding a great deal of debt. Debtor's Disclosure Statement, Dckt. No. 210, pp. 1-2; Bank's Disclosure Statement, Dckt. No. 230, p. 2. Among that debt were four notes held by Durden Banking Company, Inc. ("Durden Bank"), secured by five separate but contiguous tracts of land in Candler and Emanuel counties, and a one-half undivided interest in a one acre tract on which a family residence is located.

Debtor filed bankruptcy on March 3, 2009. Petition, Dckt. No. 1. During

the course of the bankruptcy, Debtor has reduced his debt by selling some real estate and applying the proceeds to the outstanding debt. <u>Debtor's Disclosure Statement</u>, Dckt. No. 210, p. 2; <u>Bank's Disclosure Statement</u>, Dckt. No. 230, p. 2. Debtor later proposed a Plan and Disclosure Statement. <u>Debtor's Proposed Plan</u>, Dckt. No. 211; <u>Debtor's Proposed Disclosure Statement</u>, Dckt. No. 210. That original proposed Disclosure Statement valued Durden Bank's remaining claim at $378,382.04 (as of October 4, 2010). <u>Debtor's Proposed Disclosure Statement</u>, Dckt. No. 210, p. 2. Debtor arrived at that value by attributing to Durden Bank 4% interest during the post-petition, pre-confirmation period ("Pendency Period"). <u>Brief</u>, Dckt. No. 257, p. 3. That 4% figure is based on the Supreme Court's ruling in <u>Till v. SCS Credit Corp.</u>, 541 U.S. 465 (2004). Debtor has since filed an Amended Disclosure Statement, which still proposes to value Durden's Bank claim using 4% interest during the Pendency Period, and proposes to pay Durden Bank's claim at 4% post-confirmation. <u>First Amended Disclosure Statement</u>, Dckt. No. 259, p. 4.[1] Durden Bank has also objected to the Amended Disclosure Statement. <u>Objection</u>, Dckt. No. 265 (Feb. 24, 2011).

Unsurprisingly, Durden Bank objects to this treatment, and asserts that it is entitled to the non-default contract rate ("Contract Rate") during the Pendency Period. Durden Bank has proposed an alternate Disclosure Statement which would accrue interest on Durden Bank's claim at the Contract Rate during the Pendency Period. The Contract Rate

---

[1] The <u>First Amended Disclosure Statement</u> does alter the repayment period of Durden Bank's claim. Dckt. No. 259, p. 4.

on the largest of the four notes at issue is 8%, and the Contract Rate on the remaining three notes is 10.25%. Id. Calculating Durden Bank's claim at this rate would yield a claim in the amount of $559,555.08 (as of October 6, 2010). The default rate on the notes, which Durden Bank is not asserting in computing the amount of its claim, is 16%. Id. A hearing was held to adjudicate the viability of the competing Disclosure Statements. During that hearing the parties agreed that before they could move forward with a Disclosure Statement, this Court must determine the interest rate to be applied to Durden Bank's claim during the Pendency Period.

Durden Bank has already moved this Court to convert this case to a Chapter 7. In an order denying conversion, I noted that Durden Bank objected to a 4% post-confirmation interest rate and the proposed fifteen year term of repayment, and I held that Debtor had filed a plan which *may* prove to be confirmable. Order, Dckt. No. 217 (November 11, 2010). I noted at that time that Durden Bank was well protected by its collateral. The parties now agree that the foundation of a successful Disclosure Statement is a determination of the amount of Durden Bank's claim, upon which the remaining terms of the Disclosure Statement can be erected. Because the parties agree upon the remaining principal amount of Durden Bank's claim, the only issues to be determined are the interest rate which applies to that principal during the Pendency Period, and the post-confirmation interest rate which will apply to creditors' claims.

## CONCLUSIONS OF LAW

### I. PENDENCY INTEREST

> Directly or by implication, the Bankruptcy Code provides for three categories of interest: (1) interest accrued prior to the filing of the bankruptcy petition (prepetition interest); (2) interest accrued after the filing of a petition but prior to the effective date of a reorganization plan (pendency interest); and (3) interest to accrue under the terms of a reorganization plan (plan interest).

In re Milham, 141 F.3d 420, 422-23 (2nd Cir. 1998). At issue in this case is Durden Bank's assertion that it is due the Contract Rate for the time during which pendency interest accrues.

The Bankruptcy Code specifically addresses the issue before the Court, that is, post-petition, pre-confirmation interest. 11 U.S.C. § 506(b) provides that:

> To the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

A plain-meaning reading of that language reveals that allowable interest need not be subjected to an inquiry on reasonableness, while fees, costs, and charges must be "reasonable." However, Debtor cites United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989) for the proposition that the phrase "'provided for under the agreement under

4

which such claims arose' does not apply to the phrase 'interest on such claim.'" Brief, Dckt. No. 257, p. 2.

In fact, the Court in Ron Pair did not address either the rate to be applied or the source of the rate to be applied. Debtor misreads both the holding of Ron Pair and the thrust of the paragraph at issue. The holding in Ron Pair is that § 506(b) entitles an oversecured lien creditor to receive postpetition interest. Id. at 237. Because the oversecured creditor's claim arose from a lien, there was no "contract" interest rate. Nevertheless, the oversecured creditor's entitlement to post-petition interest on the claim was "unqualified." Id. at 241.

Without guidance from the Supreme Court as to the appropriate interest rate to apply, I turn my attention to a court closer to home that has addressed this issue. There, a Georgia bankruptcy court noted that:

> There appear to be two different approaches to determining whether post-petition default [contract] interest is allowable as part of the secured claim of an oversecured creditor. The first approach holds that default [contract] interest is allowable in bankruptcy, so long as it would be enforceable under state law. The second approach requires the bankruptcy court to review the equities of the case to determine whether the default [contract] interest rate should be paid.

In re Cliftondale Oaks, LLC, 357 B.R. 883, 885 (Bankr. N.D. Ga. 2006) (citations omitted).

The court in <u>Cliftondale</u> ultimately found that the secured creditor was entitled to default contract interest under either approach. I will address these two approaches in order.

### A. Allowable Under State Law

Debtor's brief acknowledges that "many courts . . . utilize the contract rate, regardless of its relevancy to the current market conditions, the condition of the bankruptcy estate, or any other factor." <u>Brief</u>, Dckt. No. 257, p. 5. Here, Debtor's assertion is correct.

> The great majority of courts to have considered the issue since <u>Ron Pair</u> have concluded that postpetition interest should be calculated at the rate provided in the agreement, or other applicable law, under which the claim arose—the so-called "contract rate" of interest. This is consistent both with cases decided before <u>Ron Pair</u> as well as pre-Code case law.
>
> There are several reasons why section 506(b) should not be construed as supplying a means for engrafting special bankruptcy interest rates on allowed secured claims, First, section 506(b) does not expressly authorize the imposition of special bankruptcy interest rates. Second, section 506(b) does not prescribe meaningful standards for determining what an appropriate rate might be. Finally, the section lacks the kinds of protections contained in the Bankruptcy Code provisions intended to permit modification of the rate at which interest accrues on secured claims. Moreover, there is no basis upon which to infer from the language or purpose of section 506(b) that Congress intended section 506(b) to authorize special bankruptcy rates of interest.

4 COLLIER ON BANKRUPTCY ¶ 506.04[2][b][I] (Alan N. Resnick & Henry J. Sommer eds.,

16th ed.); *see also* <u>In re Milham</u>, 141 F.3d 420, 423 (2nd Cir. 1998) ("Most courts have awarded pendency interest at the contractual rate . . . ."); <u>In re Holmes</u>, 330 B.R. 317, 320 (Bankr. M.D. Ga. 2005) ("Most courts have allowed, or at least recognized a presumption of allowability for, [contractual] default rates of interest, provided that the rate is not unenforceable under applicable nonbankruptcy law."); <u>In re Garner</u>, 2010 WL 3021657, *2 (Bankr. M.D. Ala.) (holding that "post-petition interest accrues at the contract rate until the effective date of the plan" and allowing the post-petition non-default contractual rate of 10.5% to accrue until confirmation, after which a new rate applies); <u>In re Hughes</u>, 230 B.R. 213, 230 (Bankr. M.D. Ga. 1998) (holding that "when a creditor is oversecured, solvency is not required for the creditor to be entitled to postpetition interest and fees," and granting contractual (default) interest to the oversecured creditor of approximately 24%). The Contract Rate in this case (18%) does not violate Georgia law. O.C.G.A. § 7-4-2; O.C.G.A. § 7-4-18 (allowing interest rates of up to 5% per month on principal amounts of $250,000.00 or more).

I agree with these cases. The Bankruptcy Code does not require interest on the secured claim to be subjected to a "reasonableness" inquiry, as it does with fees and costs in § 506(b). Clearly, interest is treated differently under the statute, and I hold that interest accrues during the Pendency Period at the Contract Rate.

B. <u>Equities of the Case</u>

In the alternative, Debtor argues that "[t]he governing principles of

bankruptcy are [to] ensure an equitable allocation of assets to all creditors," and that allowing Durden Bank to collect default interest rates "in the face of a prevailing prime rate of 3.25%, no risk of non-payment, and a 200% equity cushion" would be inequitable. Brief, Dckt. No. 257, p. 6. I do not agree that the "equities" are so clear in this case, even if they were to determine the outcome. The court in Cliftondale noted that a because the bankruptcy estate was solvent, honoring a creditor's contractual right to default interest would have no effect on junior creditors. Cliftondale, 357 B.R at 886. In fact, "[d]isallowing [the over-secured creditor's] contractual right to default interest . . . would only serve to benefit the [d]ebtor's equity holders, who are essentially the entities who agreed to the terms of the Note in the first instance." Id. In the instant case, Debtor's solvency is dispositive on this contention. Summary of Schedules, Dckt. No. 16. In re Sublett, 895 F.2d 1381 (11th Cir. 1990) (holding that an oversecured creditor is entitled to post-petition interest if the creditor is oversecured *or* if the estate proves to be solvent); *cf.* In re Holmes, 330 B.R. 317, 321 (Bankr. M.D. Ga. 2005) (noting that an estate need not be solvent for an oversecured creditor to be entitled to postpetition interest rates); In re Hughes, 230 B.R. 213, 230 (Bankr, M.D. Ga. 1998) (same). No inequity to any junior creditor would occur if Durden Bank is granted interest on the secured claim at the Contract Rate. Debtor seeks to avoid the contractually provided interest rate solely out of concern for retaining as much equity for himself as possible.

For the foregoing reasons I hold that Durden Bank's claim is to be calculated with accruing interest at the Contract Rate during the Pendency Period.

## II. TILL INTEREST RATES

A. Pendency Interest

Debtor's proposed Disclosure Statement values Durden Bank's claim using a 4% interest rate during the Pendency Period. Debtor has explained to this Court that he arrived at that rate by applying by the "formula approach" as set forth in Till v. SCS Credit Corp., 541 U.S. 465 (2004). Brief, Dckt. No. 257 (Feb. 3, 2011). It should be noted that the interest rate in Till concerned a cram-down interest rate, not a Pendency Period interest rate. Therefore Till requires no different result than the one I reached above.

The question before this Court pertains exclusively to the viability of the Disclosure Statements.[2] Debtor's Proposed Disclosure Statement values Durden Bank's claim using a rate other than the Contract Rate during the Pendency Period. I reject that valuation method and Debtor's Disclosure Statement is unapprovable on this basis alone.

B. Post-Confirmation Interest

Debtor's Proposed Disclosure Statement also reveals a proposed 4% post-confirmation interest rate (which Debtor advances as the Till rate) to be applied to the repayment of Durden Bank's claim. For the reasons that follow I hold Till to be of limited applicability to Chapter 11 post-confirmation rate analysis, and I deny approval of Debtor's Proposed Disclosure Statement on that ground as well.

---

[2] On January 7, 2011 this Court conducted a hearing on Debtor's Proposed Disclosure Statement and Durden Bank's Proposed Disclosure Statement. I took the matter under advisement at the conclusion of that hearing.

Till was decided in the context of a Chapter 13 cram-down interest rate dispute. 541 U.S. at 479-81 (holding that for purposes of cram-down in a Chapter 13 case, the "formula approach" is to be used); Drive Fin. Servs, L.P. v. Jordan, 521 F.3d 343, 350 (5th Cir. 2008) (holding that Till, as a plurality opinion, is "binding precedent [only] in cases presenting an essentially indistinguishable factual scenario"); In re American HomePatient, Inc., 420 F.3d 559, 568 (6th Cir. 2005) ("[W]e decline to blindly adopt Till's endorsement of the formula approach for Chapter 13 cases in the Chapter 11 context. Rather, we opt to take our cue from Footnote 14 of the [Till] opinion, which offered the guiding principle that 'when picking a cram down rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce.'").

In Till, the petitioners purchased a used truck, financing the purchase amount with the seller. The seller immediately assigned the retail installment contract to SCS Credit Corp. ("SCS"). The indebtedness was $8,285.24. A year later, the petitioners filed a joint petition for relief under Chapter 13. The remaining balance owed was $4,894.89, but the parties stipulated the truck was worth $4,000.00. Debtors' proposed plan called for interest to be paid on the secured portion of SCS's claim at 9.5%. Debtor arrived at this interest rate by taking the prime rate (8% at the time) and increasing it by 1.5% to account for the risk of non-payment. SCS objected, claiming that 21% was a standard rate for sub-prime loans. Debtors proffered testimony that the 9.5% rate was fair and reasonable, given the goal of bankruptcy and the supervision of the court.

The Court considered and rejected three approaches to setting the cram-down interest rate: (1) the "coerced loan approach" (which requires the Bankruptcy Court to make a determination of the market for loans to similarly situated—although not bankrupt—debtors), (2) the "presumptive contract approach" (which focuses on the creditor's potential use of the proceeds of a foreclosure sale and allows evidence of creditors' financial circumstances to guard against overcompensation), and (3) the "cost of funds approach" (which considers the cost that would be imposed upon the creditor if it were to make the loan).

Ultimately, the Court in Till[3] authorized a "formula approach." The formula approach begins with the national prime rate and adjusts upward, with the size of the adjustment based on factors such as "opportunity costs of the loan, the risk of inflation, . . . the relatively slight risk of default," "the circumstances of the estate, the nature of the security, and the duration and feasibility of the plan." 541 U.S. at 479. The Court recognized that courts have generally approved adjustments of 1%-3%. Id. at 480. Debtor, like many other litigants, has latched onto the 1%-3% range mentioned by the Till Court in formulating his Plan, and describes the resulting number as a "Till rate." However, Debtor's reliance on that Till *number*, as opposed to the Till *process*,[4] is misplaced for three reasons:

---

[3] This approach was authorized by the plurality. Justice Thomas (as the fifth vote to remand the case) proposed a "prime-only" interest rate in his concurrence.

[4] I do not hold that 4% is necessarily an inappropriate post-confirmation interest rate. I do hold that "prime + 1%-3%" is not a *per se* valid post-confirmation interest rate, and that Debtor must provide justification for the post-confirmation rate he has selected.

First, the opinion was decided 5-4, with one of the five votes to reverse being Justice Thomas' concurrence. This split casts doubt on the approach adopted by the plurality (the formula approach).

Second, the only holding in Till was to remand to the Bankruptcy Court to have the appropriate interest rate to be applied in that particular cram-down Chapter 13 case.

Third, the formula suggested by the Court (and remanded to the bankruptcy court) starts with the prime rate and adjusts upward for opportunity cost, the risk of inflation, and the risk of default. The size of those adjustments depend on the circumstances of the estate, the nature of the security, the duration and feasibility of the reorganization plan, the opportunity costs of the loan, the risk of inflation, and the risk of default. The Court opined (in dicta) that "[t]he Bankruptcy Court in [that] case approved a risk adjustment of 1.5%, and other courts have generally approved adjustments of 1% to 3%." Till, 541 U.S. at 480. However, the Court expressly held that "[w]e do not decide the proper scale for the risk adjustment, as the issue is not before us," and expressly made no finding of the appropriate adjustment. Id. at 467, 480.

Based on the foregoing, I conclude that—in setting post-confirmation interest rates in a Chapter 11—pre-Till interest rate precedent is still good law. In In re

Southern States Motor Inns, Inc.,[5] the Eleventh Circuit considered the "rate of interest to be applied in calculating deferred payments of delinquent federal taxes pursuant to" the Bankruptcy Code for confirmation purposes. 709 F.2d 647, 649 (11th Cir. 1983). The court noted that the factors relevant to determining the proper interest rate are set forth in Collier on Bankruptcy, and held that

> The appropriate discount interest rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount interest rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default.

Id. at 651 (quoting 5 COLLIER ON BANKRUPTCY ¶ 1129.03, at 1129-65 (15th ed. 1982)). While that case considered the interest rate which was to accrue on delinquent taxes, it has been applied within the Eleventh Circuit to different plan confirmation scenarios. See In re Diplomat Constr., Inc., 2009 WL 6498180, *6 (Bankr. N.D. Ga. 2009) (holding that an interest rate was not "fair and equitable" for purposes of § 1129(b)(2) because it did not meet the Southern States factors, and rejecting a rate of Wall Street Prime + 1.35%); In re Oaks Partners, Ltd., 135 B.R. 440, 446 (Bankr. N.D. Ga. 1991) (noting that the formula approach is not inconsistent with Southern States and adopting a Southern States-compliant formula

---

[5] While Southern States used a coerced-loan approach to determine the appropriate interest rate, the factors enumerated by that court to be considered in determining the proper interest rate are consistent with many of the factors suggested in Till. To the extent Southern States considered an interest rate that included profit to the lender and overhead costs (the shortfalls of the coerced-loan method identified in Till), Southern States may no longer be good law. However, because other factors enumerated by that court mirror those approved by the plurality in Till, I see no other conflict between these two cases.

approach to determine "value as of the effective date of the plan" pursuant to 11 U.S.C. § 1129(b)(2)(A)(i)(II)).

Although the language used in <u>Southern States</u> differs from the language used in <u>Till</u>, the substance of the adjustments applied is indistinguishable in those two cases. <u>Southern States</u>, which is still applicable precedent in this circuit,[6] enumerates factors to consider when determining the appropriate interest rate. These factors are not at odds with the factors enumerated by the formula approach approved in <u>Till</u>.

<u>Till</u> starts with the national prime rate, and adjusts the amount based on:

       1) opportunity costs of the loan,
       2) the risk of inflation,
       3) risk of default,
       4) the circumstances of the estate,
       5) the nature of the security, and
       6) duration and feasibility of the plan.

<u>Till</u> 541 U.S. at 479.

<u>Southern States</u> starts with the prevailing market rate—which necessarily includes:

       1) opportunity costs of the loan,

and adjusts based on:

       2) the risks involved,
       3) the risk of default,
       4) the quality of the security, and
       5) the payout period.

---

[6] To the extent discussed in footnote 5.

Southern States, 709 F.2d at 651. It is axiomatic that the missing Till factor, "4) the circumstances of the estate," is relevant to all of the above. I hold that the Southern States approach remains valid as long as the court does not consider profit to the lender, transactional costs, or overhead costs which would be included in a "coerced loan" rate but are absent in a "formula" rate.

## CONCLUSION

A Disclosure Statement must be approved before a Plan can be submitted for confirmation, and it cannot be approved unless it contains information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan. 11 U.S.C. § 1125. Because Debtor's Amended Disclosure Statement fails to meet that standard in two critical respects, it cannot be approved.

Because Debtor is oversecured, § 506(b) grants postpetition interest. There being no language in the Code directing this Court which interest rate to use, I am informed by the decisions of my sister courts. Because Durden Bank's claim is oversecured, and because the Contract Rate does not violate Georgia law, I find that Durden Bank is entitled to the Contract Rate during the Pendency Period. Debtor's solvency—unnecessary to find that an oversecured creditor is due contract rate of interest—merely makes the determination all the clearer.

    I further hold that Debtor's Proposed Disclosure Statement is denied on the additional ground that its use of a Till-based *number*—as opposed to a rate derived through the *process* of applying Till and Southern States adjustments to prime—is insufficiently detailed to meet Disclosure Statement Standards. Debtor's Proposed Disclosure Statement must be modified to reveal a post-confirmation rate of interest, and the basis for approving that rate, which must be consistent with this Order. The modified Disclosure Statement must be specific enough to enable Durden Bank to make an informed judgment to either accept that rate or be prepared to carry its burden of showing the proper rate at the continued Disclosure Statement hearing. *See* 11 U.S.C. § 1125; Till, 541 U.S. at 479 ("[S]tarting from a concededly low estimate and adjusting upward places the evidentiary burden squarely on the creditors, who are likely to have readier access to any information absent from the debtor's filing.").

## ORDER

    Pursuant to the foregoing Findings of Fact and Conclusions of Law, Debtor is hereby ORDERED to file a new Disclosure Statement and Plan by March 25th, 2011.

                       _____
                         Lamar W. Davis, Jr.
                         United States Bankruptcy Judge

Dated at Savannah, Georgia

This 3rd day of March, 2011.